NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DARLENE N. GIESE,<br><br>          Plaintiff,<br><br>     v.<br><br>JO ANNE B. BARNHART,<br>COMMISSIONER OF<br>SOCIAL SECURITY<br>ADMINISTRATION,<br><br>          Defendant. | HONORABLE JEROME B. SIMANDLE<br><br>CIVIL NO. 04-6154<br><br>**OPINION** |

APPEARANCES:

Adrienne Freya Jarvis, Esq.
800 North Kings Highway
Suite 304
Cherry Hill, New Jersey 08034
     Attorney for Plaintiff

Christopher J. Christie
United States Attorney
     By:  Marla Piazza-Siegel
          Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
     Attorney for Defendant

**SIMANDLE**, District Judge:

This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g), to review the final decision of the Commissioner of the

Social Security Administration, denying the application of the

plaintiff, Darlene N. Giese, for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Social Security Act. 42 U.S.C. § 401, et seq. This Court must determine: (1) whether the ALJ's failure to make the requisite analysis of Plaintiff's medical findings was an error and prejudiced Plaintiff, (2) whether the ALJ erroneously concluded that Plaintiff's impairments, while severe, did not meet or equal a listing because the ALJ did not properly analyze the medical evidence, (3) whether the ALJ afforded proper weight to the opinions of the Plaintiff's treating physicians and erroneously substituted her own medical judgment in place thereof, (4) whether the ALJ erroneously concluded that Plaintiff maintains the residual functional capacity to perform her past relevant work, and (5) whether the ALJ's finding regarding Plaintiff's credibility is contradicted by the evidence.

**I. Background**

    A.  <u>Procedural History</u>

    Plaintiff filed her application for Disability Insurance Benefits and Supplemental Security Income Benefits on March 21, 2002 with an alleged onset date of December 21, 2001. The Plaintiff alleged severe impairments of the cervical and lumbar spines, chronic pain, obesity and depression. Plaintiff's claim was denied initially on October 6, 2002. Plaintiff filed a

2

request for reconsideration on January 22, 2003, which was denied
on March 10, 2003.  Plaintiff filed a Request for Hearing on
April 15, 2003.  The Hearing was held on March 17, 2004.  The
Administrative Law Judge (ALJ), Janice C. Volkman, found that
Plaintiff could return to her past relevant work and issued an
unfavorable decision dated April 14, 2004.  Plaintiff then
requested review by the Appeals Council.  In her appeal,
Plaintiff urged that certain findings by the ALJ (specifically
Nos. 4, 5, 6, 7, 8, 9 and 10) were not supported by substantial
evidence.  Her appeal was denied on October 22, 2004. Plaintiff
timely filed the present action on December 14, 2002.

    B. <u>Evidence in the Record</u>

        1. <u>Plaintiff's Examination by the ALJ</u>

    Plaintiff is a 44-year-old female.  (R. at 20)  Plaintiff
testified that she lives with her boyfriend at 590 Lower Landing
Road in Blackwood, NJ.  Her highest level of schooling is the
ninth grade, although she has obtained her GED.  (R. at 36)  At
the time of the hearing, her most recent employment was at Wawa
Market in the Fall of 2001.  (R. at 38)  Plaintiff testified that
she injured her back and neck lifting a bale of cardboard from a
compacting machine.  (R. at 38)  At the time of the injury,
Plaintiff had only been working at Wawa for six months and was
training as a manager.  (R. at 38)

Plaintiff at first could not remember if she had filed worker's compensation benefits, but her attorney told the ALJ that a claim for permanent disability benefits was still pending. (R. at 38)   According to Plaintiff's attorney, Wawa provided Plaintiff with treatment for a short period of time and, although her attorney did not specifically remember, presumably lost wage benefits for the same period.  (R. at 39)   Plaintiff also has a claim pending for Secondary Injury Fund benefits.  (R. at 39)

Before training as an assistant manager at Wawa, Plaintiff worked at American Automobile Association ("AAA") for approximately six months, making maps known as "Trip Tiks."  (R. at 41)  There was minimal computer use working for AAA, as the maps were primarily generated from information on a chart.  (R. at 42)  Before that, Plaintiff worked a total of 25 years as a bartender, three years at P.J.'s Saloon and 22 years at Prospector's.  (R. at 41)  As a bartender, Plaintiff would lift cases of bottled beer.  (R. at 41) Plaintiff made her highest earnings by far working for Wawa, a job she described as stressful but enjoyable.  (R. at 43)   Before her work-related accident at Wawa, Plaintiff was involved in two car accidents, one in 1999 and the other in May of 2002.  (R. at 44)  She brought a lawsuit for the 1999 accident and received about $59,000.  (R. at 44)  Plaintiff did not sue for the 2002

accident, and it seems from the testimony that this accident may have been her fault.  (R. at 44)

The ALJ asked Plaintiff why she cannot work, despite being a "young woman."  (R. at 44)  Plaintiff began by describing her depression, for which she is medicated.  (R. at 44)  According to Plaintiff, this disorder causes her uncontrollable rage and crying fits.  (R. at 44)  Although she has never hurt anyone, Plaintiff has screamed at people.  (R. at 44)

The ALJ asked why Plaintiff began with her emotional problems and if these problems are the real reason Plaintiff cannot work. (R. at 45)  Plaintiff responded by saying that she just started with her emotional problems and then detailed her physical problems.  Plaintiff testified that she has neck and back injuries as well as a severe hernia.  (R. at 45)  Plaintiff described her symptoms as having severe back pain, and when she turns her head, her back makes a sound like grinding glass.  (Tr. at 45)  Plaintiff also grinds her teeth which causes her headaches.  (R. at 45)

Plaintiff also discussed an injury to her lower back, which radiates pain down to her lower hip.  (R. at 45)  She said that small tasks like bending down to load the dishwasher cause her excruciating pain.  (R. at 46)  Plaintiff is currently taking medications called Lexipro and Resperil, as well as an anti-psychotic, the name of which she could not recall.  (R. at 46)

5

Plaintiff was previously seeking mental health treatment, but stopped when she could no longer afford it.  (R. at 46)   At the time of the hearing, she was only seeking treatment from her family doctor.  She claimed she could not find additional treatment from clinics.  (R. at 46)   When asked what she does most of the day, Plaintiff said she does not really do anything, but she cries a lot.  (R. at 47)   Plaintiff said she likes to cook, watch television and go out to dinner with her boyfriend. Plaintiff and her mother will go thrift shopping on occasion. (R. at 48)

Plaintiff explained in further detail why she believes she is unable to work.  Both sitting and being on her feet for long periods of time cause her pain in the neck and back. (R. at 49) She said she has to get up and walk around a little if she sits for two hours, but then she cannot walk for long.  (R. at 49) Plaintiff has been to physical therapists, but they have not been able to help much with the pain.  (R. at 49-50)   The most she can lift is a gallon of milk.  (R. at 50)   She does not have trouble getting dressed in the morning, except that she cannot put on socks.  (R. at 50)

The ALJ asked Plaintiff if she could do a job that was not physically strenuous.  (R. at 50)  Plaintiff responded that she was unsure.

2. <u>Plaintiff's Examination by Her Attorney</u>

Plaintiff clarified for the record that her first motor vehicle accident was on April 14, 1999.  Her work related accident at Wawa occurred on September 22, 2001 and she had another motor vehicle accident on May 20, 2002.  Plaintiff described her health before the 1999 accident as "excellent." (R. at 51) Plaintiff testified that her bartending job of 22 years at Prospector's was primarily a standing position, and that she never had any problems doing this job.  (R. at 51)

Plaintiff testified that since her 1999 accident, she gained weight (from approximately 130 pounds to 217 pounds at the time of the hearing.)  (R. at 51)  Plaintiff said she was an active person before the 1999 accident and that she was never treated by any mental health professionals.  (R. at 52)  Also, Plaintiff was never treated for any orthopedic injuries, like a back or neck problem, before 1999.  (R. at 52)

Plaintiff testified that specifically she has trouble moving her neck to the left, although moving it to the right is also painful.  (R. at 53)  The neck pain radiates down into her shoulders and part of her upper back.  (R. at 54)  Cold and damp weather exacerbate this pain.  (R. at 54)

Plaintiff testified that the pain in her back causes her difficulty in lifting things, bending over and rotating from side to side.  (R. at 55) The back pain makes it difficult to drive a

7

car and take walks.  (R. at 56)    Although she testified to the

ALJ that she can sit for up to two hours, this period of time is

not without discomfort.  (R. at 56)

Plaintiff also said that she has carpal tunnel syndrome in

both hands.  (R. at 56)  Plaintiff had surgery on her right hand,

and still wears braces at night.  (R. at 57)  She also complained

of a lack of sensitivity in her fingers.  (R. at 57)  She has

lost strength in her right hand, which makes it hard to do things

like open jars.  (R. at 58)

After her 1999 accident, Plaintiff tried to return to her

bartending job at P.J.'s Saloon, but there was too much standing.

This led to her brief employment with AAA.  (R. at 60)  She left

AAA to pursue what she believed to be a better opportunity with

Wawa.  (R. at 61)  After her work related accident, Plaintiff

sought physical therapy.  (R. at 62)  Her back and neck were re-

injured in the motor vehicle accident of 2002.  (R. at 62)

Plaintiff also testified that before her series of accidents, she

did not suffer from emotional or physical problems while working

as a bartender, and had been a regular worker during that time.

(R. at 63)  Plaintiff then clarified for the ALJ that she went to

work for AAA and Wawa after her hand surgery.  (R. at 63)

    3. Testimony of Vocational Expert Beth M. Kelly

Plaintiff's attorney saw Ms. Kelly's resume and stipulated

to her qualifications as a vocational expert.  (R. at 64)  Ms.

Kelly, having heard Plaintiff's testimony and reviewed the record, described Plaintiff's prior work experience. (R. at 64) She described Plaintiff's bartending work as semi-skilled, generally classified as a light exertion level. (R. at 64) If she had to lift boxes of beer, which usually way about 20 pounds, her job would be classified as medium. (R. at 64) At AAA, her job was best described as a travel clerk and was unskilled and light. (R. at 65) At Wawa, she was in training to be a retail store manager. (R. at 65) Because she was only there 6 to 8 months, she did not get to store manager level which requires two to four years of specific vocational training. (R. at 65) However, because she was training and doing a little bit of everything, Ms. Kelly characterized the work as medium. (R. at 65)

Ms. Kelly stated that Plaintiff did not have the skills to take another management position. (R. at 65) She also opined that Plaintiff could not return to working as a bartender, a job she described as hectic. (R. at 66) Ms. Kelly did say Plaintiff should be able to return to work as a travel clerk, which is simple, unskilled, and low stress work, in her opinion. (R. at 66)

The ALJ asked Ms. Kelly hypothetical questions with regard to any positions with low stress, sedentary work and an option to sit or stand. (R. at 66) Ms. Kelly said that there are

9

approximately 2,100 sedentary unskilled assembler positions in the region, and 120,000 nationally.  (R. at 66-67)  Ms. Kelly also said there are sedentary cashier positions at places like the airport, where someone could sit but stand up if needed.  (R. at 67)  Ms. Kelly stated there are also about 2,100 of these jobs regionally, and 150,000 nationally.  (R. at 67)

The ALJ also asked Ms. Kelly about Plaintiff's inability to concentrate due to pain, assuming Plaintiff's complaints were credible.  (R. at 67)  Ms. Kelly said that if Plaintiff was having frequent lapses in concentration, which would be up to two-thirds of the day, she would not be able to sustain work activities because she would not be productive.  (R. at 67)

Next, Plaintiff's attorney questioned Ms. Kelly about her responses to the ALJ's hypothetical questions.  (R. at 68)   Ms. Kelly stated that her suggestions, such as an assembler position, did not take into account Plaintiff's carpal tunnel syndrome. (R. at 68)  Plaintiff's attorney also asked Ms. Kelly to reiterate her position as to Plaintiff's emotional troubles.  Ms. Kelly again stated that, if credible, these problems would prevent her from engaging in the positions she suggested in response to the ALJ's hypothetical questions. (R. at 69)

C. Medical Records

Plaintiff's impairments originated with a motor vehicle accident on April 14, 1999.  In Dr. Antolik's report dated May

13, 1999, he found injuries to Plaintiff's cervical spine, lumbar spine and hands.  (R. at 271)  The same report noted degenerative changes in Plaintiff's spine.  (Id.)  According to Dr. Testaiuti, in a letter dated November 20, 2000, Plaintiff reported no musculoskeletal symptoms prior to the 1999 accident.  (R. at 300)

Following the 1999 accident, Dr. Gary Goldstein reported that Plaintiff re-injured her back while bending down to pick up a light-weight object.  (R. at 262)  After noting that Plaintiff suffered significant muscular spasm in her back and that Plaintiff was extremely sensitive to touch, Dr. Goldstein treated Plaintiff with a lumbar epidural and trigger point injections. (R. at 262, 260)  A week later, Dr. Goldstein observed that Plaintiff had improved quality of motion, but that she was having allergic reactions to the pain medication.  (R. at 260)  On June 28, 1999, Dr. Goldstein wrote that, "Plaintiff is a tough individual who keeps pushing on, but I do not think we are getting anywhere here."  (R. at 265)

On March 28, 2000, Dr. Goldstein reported another injury, where Plaintiff claimed she fell at work and "took the impact to her hand." (R. at 248)  On May 10, 2000, after Plaintiff tried to return to work as a bartender, she complained that the pain was even worse.  (R. at 247)  On July 11, 2000, Dr. Goldstein gave Plaintiff eight trigger point injections in her right shoulder. (R. at 245)  In total, Dr. Goldstein completed 15 typed reports

concerning Plaintiff's pain and injuries, plus an operative report for her right carpal tunnel surgery.  (R. at 245-70)

Indeed, Dr. Goldstein utilized many therapies to treat Plaintiff: pain medication (R. at 245, 252, 253, 255, 256, 258-59, 260, 263-64, 265, 271), medication for sleep (R. at 248, 250, 256, 265, 271), medication for depression (R. at 245), splints (R. at 271), physical therapy (R. at 271, 265, 249), back braces (R. at 249), and right carpal tunnel surgery (R. at 241-42).  In his last report, dated July 11, 2000, Dr. Goldstein wrote, "Prognostic thoughts, poor."  (R. at 246)  Dr. Goldstein referred Plaintiff to Dr. Mark Testaiuti, a neurosurgeon.  (R. at 304)

Dr. Testaiuti treated Plaintiff from August 17, 2000 to April 5, 2002.  In April of 2001, Plaintiff began working for Wawa, but continued to complain of pain in her neck and lower back, headaches, difficulty sleeping, pain and loss of feeling in her hands, pain and buckling in her left leg and foot, fatigue, pain in both shoulders and hips, and depression.  (See Dr. Testaiuti's reports, R. at 168-73, 178-79, 291-99, and 300-06) Dr. Testaiuti ordered laboratory tests, additional epiderals and various pain medications.  (Id.)

On September 22, 2001, Plaintiff had a fourth injury, re-injuring her neck and back while pulling out bales of crushed cardboard from the Wawa trash compactor.  (R. at 38, 183)  Dr. Testaiuti observed that Plaintiff walked with a limp favoring her

right leg.  (R. at 291-92)  A straight leg raise caused back pain on the right.  (R. at 292)  Dr. Testaiuti observed that Plaintiff walked in a stooped manner.  (R. at 173)  On December 22, 2001, Plaintiff went to the emergency room because of low back pain and she continued to seek medical options for pain control.  (R. at 172, 285)

Dr. Testaiuti ordered a provocative diskography to determine if surgery were an option.  ((R. at 173, 292)  The laboratory findings convinced him that neither cervical surgery nor lumbar surgery was an option. (R. at 170, 173)  Dr. Testauiuti wrote, "The best I might be able to recommend would be permanent disability status if nothing surgical can be done and she does not feel that she can tolerate any sort of employment options in her present condition."  (R. at 170)  He also prescribed her a three-in-one commode, a cane, and a lumbar support corset. (R. at 171)

Plaintiff has been on anti-depressants since 1999.  (R. at 271)  The medical records also note other impairments, including severe migraine headaches and blurred vision.  (See generally R. at 178, 245, 251, 269, 295, 314, 318, 320, 322)  Plaintiff listed migraine headaches in her Social Security Disability Report.  (R. at 115, 123)  While this claim was pending, Plaintiff was involved in another motor vehicle accident in 2002. (R. at 21, 311)  In May of 2002, Dr. Wilson saw Plaintiff and

13

only found that Plaintiff had minimally reduced strength.  (R. at 321)  The Plaintiff was seen by Dr. Citta-Pietrolungo in July of 2002, and this exam revealed normal muscle bulk and tone, as well as no atrophy.  (R. at 207-08)  Dr. Citta-Pietrolungo assessed her as being independent in her self care while performing her functions slowly and carefully to avoid further strain and sprain to the cervical and lumbar spine, but having no radicular symptoms, while taking medication for depression. (Id.)

Plaintiff visited the Center for Family Services in February of 2002, and was examined by Dr. Ball.  (R. at 196)  Dr. Ball assigned Plaintiff's Global Assessment of Functioning at 60. (R. at 197)  Her medications then included Celexa, Neurontin, Valium, Percocet, and Methadone.  (R. at 198)  Dr. Robert J. Waters examined patient for the Division of Disability Determination Services and opined that Plaintiff's mental symptoms were mainly due to her physical condition, and that these physical conditions represent her most formidable obstacle to work.  (R. at 204)  A. M. Prione, M.D., a state agency physician, examined Plaintiff and found that she can occasionally lift up to 20 pounds, frequently lift 10 pounds, and stand or walk up to six hours out of an eight hour work day.  (R. at 234)

Dr. Prione opined that her chronic pain management gives some credibility to her pain symptoms, but that the severity of pain she reports is disproportionate to the objective findings,

14

perhaps due to an emotional overlay.  (R. at 238)  Dr. Prione

further opined there is no objective reason for the alleged

difficulties with sitting and standing, as there are minimal

objective findings in her clinical exam.  (Id.)

**II. Discussion**

    A.   <u>Standard of Review</u>

    Under 42 U.S.C. § 405(g), Congress provided for judicial

review of the Commissioner's decision to deny a complainant's

application for Disability Insurance Benefits.  <u>Ventura v.</u>

<u>Shalala</u>, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must

uphold the Commissioner's factual decisions where they are

supported by "substantial evidence."  42 U.S.C. §§ 405(g),

1383(c)(3); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir.

2001); <u>Sykes v. Apfel</u>, 228 F.3d 259, 262 (3d Cir. 2000); <u>Williams</u>

<u>v. Sullivan</u>, 970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial

evidence means more than "a mere scintilla."  <u>Richardson v.</u>

<u>Perales</u>, 402 U.S. 389, 401 (1971)(quoting <u>Consolidated Edison Co.</u>

<u>V. NLRB</u>, 305 U.S. 197, 229 (1938)).  It means "such relevant

evidence as a reasonable mind might accept as adequate to support

a conclusion."  <u>Id</u>.  The inquiry is not whether the reviewing

court would have made the same determination, but whether the

Commissioner's conclusion was reasonable.  <u>See</u> <u>Brown v. Bowen</u>,

845 F.2d 1211, 1213 (3d Cir. 1988).

A reviewing court has a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). "[A] court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951)).

The Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The Third Circuit has held that an "ALJ must review all pertinent medical evidence and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).  Similarly, an ALJ must also consider and weigh all of the non-medical evidence before him.  Id. (citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983); Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981).

The Third Circuit has held that access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).  A district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams, 970 F.2d at 1182.  However, an ALJ need not explicitly discuss every piece of relevant evidence in his decision.  See Fargnoli v. Massanari, 247 F.3d at 42.

Moreover, apart from the substantial evidence inquiry, a reviewing court is entitled to satisfy itself that the Commissioner arrived at his decision by application of the proper legal standards.  Sykes, 228 F.3d at 262; Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).

B.   Standard for Disability Insurance Benefits

The Social Security Act defines "disability" for purposes of an entitlement to a period of disability and disability insurance benefits as the inability to engage in any substantial gainful activity by reason of any medically determinable physical and/or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See 42 U.S.C. §1382c(a)(3)(A).  Under this definition, a claimant qualifies as disabled only if his physical or mental impairments are of such severity that he is not only unable to perform his past relevant work, but cannot, given his age, education, and work experience,

17

engage in any other type of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  42 U.S.C. § 1382c(a)(3)(B)(emphasis added).

The Commissioner has promulgated regulations for determining disability that require application of a five-step sequential analysis.  See 20 C.F.R. § 404.1520.  This five-step process is summarized as follows:

1.  If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."

2.  If the claimant does not suffer from a "severe impairment," he will be found "not disabled."

3.  If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."

4.  If the claimant can still perform work he has done in the past ("past relevant work") despite the severe impairment, he will be found "not disabled."

5.  Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education, and past work experience to determine whether or not he is capable of performing other work which exists in the national economy.  If he is incapable, he will be found "disabled."  If he is capable, he will be found "not disabled."

20 C.F.R. § 404.1520(b)-(f).  Entitlement to benefits is therefore dependent upon a finding that the claimant is incapable of performing work in the national economy.

This five-step process involves a shifting burden of proof. See Wallace v. Secretary of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983).  In the first four steps of the analysis, the burden is on the claimant to prove every element of his claim by a preponderance of the evidence.  See id.  In the final step, the Commissioner bears the burden of proving that work is available for the plaintiff: "Once a claimant has proved that he is unable to perform his former job, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he is able to perform."  Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  See Olsen v. Schweiker, 703 F.2d 751, 753 (3d Cir. 1983).

Here, ALJ Volkman found, in a careful and comprehensive decision (R. at 16-27), that Plaintiff had not been under a disability, as defined in the Social Security Act as amended, at any time since her alleged onset date of disability, i.e., December 21, 2001, through the date of the decision.  At step one, despite some confusion over reported earnings past her end date, the ALJ found Plaintiff had not engaged in substantial gainful employment since the onset of her disability.  At step two, the ALJ found that Plaintiff's cervical spine, lumbar spine, obesity (in combination), and depression are "severe" within the meaning of the Regulations.  However, at step three, the ALJ determined that none of these impairments are severe enough to

meet or medically equal the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1.  At step four, the ALJ found that Plaintiff retains the residual functioning capacity to perform the requirements of her past relevant work as a travel counselor at AAA.

C.   Plaintiff's Arguments

Plaintiff's brief makes five arguments why the ALJ's finding that Plaintiff is not eligible for disability benefits or supplemental income is incorrect.  First, Plaintiff argues that the ALJ's failure to make the requisite analysis of Plaintiff's medical findings was errorneous and prejudiced Plaintiff. Second, Plaintiff argues that the ALJ erroneously concluded that Plaintiff's impairments, while severe, did not meet or equal a listing because the ALJ did not properly analyze the medical evidence. Third, Plaintiff argues the ALJ did not afford proper weight to the opinions of the Plaintiff's treating physicians and erroneously substituted her own medical judgment in place thereof.  Fourth, Plaintiff argues the ALJ erroneously concluded that Plaintiff maintains the residual work capacity to perform her past relevant work.  Fifth, Plaintiff argues that the ALJ's findings regarding Plaintiff's credibility are contradicted by the evidence.  For the following reasons, this Court will affirm the decision of the ALJ and Plaintiff's application will be denied.

### 1. **Whether the ALJ failed to make the requisite analysis of Plaintiff's medical findings which was erroneous and prejudiced Plaintiff**

Plaintiff argues that the ALJ "refused" to address evidence from 1999 and 2000, and that this refusal produced an erroneous finding that Plaintiff was not under disability. (Pl. Br. at 18-19)  The Commissioner counters that medical evidence from 1999 and 2000 is dated well before the alleged onset of disability, and therefore such evidence is not dispositive of whether Plaintiff was disabled on or after December 21, 2001. Furthermore, the Commissioner argues that the ALJ in fact did consider evidence from 1999 and 2000 in her analysis and therefore, even if such evidence were dispositive, Plaintiff was not prejudiced.

Indeed, the ALJ did consider evidence from 1999 and 2000. Specifically, the ALJ discussed the Plaintiff's motor vehicle accident in 1999 and the resulting claims of musculoskeletal injury.  (R. at 21)  Also, the ALJ noted a nerve conduction study and electromyogram showing chronic mild C7 radiculopathy conducted in August of 2000.  (Id.)  The ALJ mentioned clinical findings of Plaintiff's treating physicians related to musculoskeletal conditions and complaints of depression that took place prior to December of 2001. (R. at 23-24)  Finally, the ALJ discussed Plaintiff's 1999 carpal tunnel surgery and recovery. (R. at 23)

21

Plaintiff also argues that the ALJ did not consider the opinions given by Dr. Testaiui, Dr. Goldstein and Dr. Rogers about Plaintiff's musculoskeletal condition.  Indeed, an "ALJ must review all pertinent medical evidence and explain his conciliations and rejections."  <u>Burnett</u>, 220 F.3d at 122.  Plaintiff asserts that she had a lengthy treating relationship with both Goldstein and Testaiuti, and that their opinions are entitled to controlling weight.

While it is true that Dr. Goldstein's name does not appear in the ALJ's opinion, and that she and the Plaintiff had a lengthy treating relationship, this does not mean the ALJ wholly disregarded his opinions.  An ALJ need not explicitly discuss every piece of relevant evidence in her decision.  <u>See</u> <u>Fargnoli</u>, 247 F.3d at 42.  Here, the ALJ discussed the opinions of both Dr. Testaiuti and Dr. Rogers.  (R. at 21-22)

Furthermore, nothing in the reports of Drs. Goldstein,[1] Testaiuti or Rogers gives a firm conclusion that Plaintiff is disabled.  The strongest indication of such is Dr. Testaiuti's conclusion that he would recommend disability "if nothing surgical can be done and she does not feel that she can tolerate any sort of employment options in her present condition."  (R. at 170)  The ALJ adequately explained that her opinion was based on MRIs, CAT Scans and other studies done in 2001, leading up to the period of alleged disability. (R. at 21)  This Court is satisfied that the ALJ considered the relevant evidence and adequately explained why she did not afford portions from 1999 and 2000 substantial weight.

---

[1] The record reflects that Dr. Gary Goldstein treated plaintiff from May 13, 1999 to July 11, 2000.  (R. at 241-271) He is an orthopedic surgeon who treated her hand, neck, shoulder, and back pain.  Her hand improved after surgery on September 9, 1999 (R. at 241) until the point where she was "happy with her hand" by December 9, 1999, which was almost asymptomatic.  (R. at 251)  Various courses of pain medications were prescribed over the period of treatment for various acute and chronic pains. Plaintiff was generally working throughout the period of Dr. Goldstein's treatment, and the record contains no indication that she was unable to work at that time.  It is understandable that the ALJ would not see the need to specifically discuss Dr. Goldstein's impressions of plaintiff.

2.   **Whether the ALJ erroneously concluded that Plaintiff's impairments, while severe, did not meet or equal a listing because the ALJ did not properly analyze the medical evidence**

Plaintiff argues that the ALJ improperly evaluated the medical evidence related to her musculoskeletal conditions because she did not find that Plaintiff met Listing 1.04, and that Plaintiff's depression disorder did not meet Listing 12.04. (Pl. Br. at 21-28)

a. Plaintiff's argument concerning Listing 1.04(A)

First, Plaintiff cites numerous laboratory studies and clinical examinations to support her claim that her cervical and lumbar spinal conditions met Listing 1.04(A)(Disorders of the Spine).  Listing 1.04 requires that spinal conditions be accompanied by the following:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.04(A).  It is the Plaintiff's burden to present medical findings that show that her impairments meet a listing or are equal in severity to a listed impairment.  Burnett, 220 F.3d at 120, n.2 quoting Williams v. Sullivan, 970 F.2d 1178 (3d Cir. 1992).  Furthermore, to meet a listed impairment, it is not enough that Plaintiff have only one or a few of the required impairments.  Plaintiff must satisfy all

24

of the specified medical criteria.  <u>Sullivan v. Zelby</u>, 493 U.S. 521, 530 (1990)(emphasis added).

Plaintiff urges that the objective medical evidence meets Listing 1.04(A), and relies on a series of MRIs and Plaintiff's pain treatments to support this assertion.  Specifically, Plaintiff's brief cites MRIs from November of 1999 through May of 2000 which revealed disc herniation, DDD, cervical spondylosis, spinal stenosis, and severe neural foraminal stenosis, among other conditions of the spine.  From these conditions, Plaintiff argues that she "clearly . . . meets the criteria of 1.04(A)." (Pl. Br. at 22)[2]

However, Plaintiff has satisfied some, but not all, of the criteria in Listing 1.04(A).  The Commissioner concedes that Plaintiff's MRIs and CT scans all revealed some degree of herniation, bulging, stenosis, degenerative changes and spondylolisthesis.  (Def. Br. at 9)  The Commissioner asserts that Plaintiff has not established evidence of the requisite motor loss or positive neurological signs resulting in extreme loss of function, and this Court agrees.

_____

[2] Plaintiff also argues that her musculoskeletal injuries cause her severe pain, and that her pain complaints are supported by competent medical evidence.  However, nothing in the ALJ's opinion leads the Court to believe that the ALJ disregarded this evidence.  Furthermore, this argument is more appropriately discussed with the ALJ's impression of Plaintiff's credibility, which will be discussed in Section II.C.5, <u>infra</u>.

Dr. Goldstein's first examination of Plaintiff in May of 1999 showed no muscle atrophy, normal reflexes, and normal strength (R. at 268-71)  After her carpal tunnel surgery, Dr. Goldstein noted improvement in Plaintiff's hand and no numbness. (R. at 243-53)  Dr. Rogers noted reduced range of cervical and lumbar range motion in 2001 and 2002, but Plaintiff's neurological signs were always normal, including intact deep tendon reflexes and sensation.  (R. at 150, 155, 183-84)  Dr. Testaiuti examined Plaintiff in August 2000 and noted normal motor strength, muscle bulk and tone, and intact deep tendon reflexes.  (R. at 304-06).

When Dr. Wilson saw Plaintiff in May 2002, the day after Plaintiff was in a motor vehicle accident, he only found minimally reduced strength.  (R. at 321)  He did find reduced sensation in the fourth and fifth fingers of Plaintiff's right hand, but her deep tendon reflexes were intact throughout.  (R. at 322-34).  Dr. Citta-Pietrolungo's consultative exam with Plaintiff in July 2002 showed no muscle atrophy, and normal muscle bulk and tone.  (R. at 207-08).  Similarly, examinations by Drs. Ressler and David in 2002 and 2003, respectively, showed normal motor strength, deep tendon reflexes and sensation.  (R. at 314-17, 325-36)

The ALJ's finding that Plaintiff has not demonstrated the requisite loss of muscle strength, sensation, and reflex to

satisfy Listing 1.04(A) is supported by substantial evidence. Accordingly, Plaintiff's claim as to this point fails.

> b. Plaintiff's argument concerning Listing 12.04

Plaintiff also argues that the ALJ improperly found that Plaintiff did not meet the requirements of Listing 12.04. The Commissioner concedes Plaintiff's diagnosis of major depression and the presence of some depressive symptoms. (Def. Br. at 12) However, the mere presence of a depressive disorder is not enough to meet the requirements of Listing 12.04. Plaintiff must also establish two of the four criteria set forth in 12.04(B), which are: 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; and 4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. 404, Subpart P, Appendix 1 § 12.04(B).

This Court agrees that with the ALJ's determination that Plaintiff was only mildly limited in the area of carrying out daily activities and maintaining social function, and moderately limited in the area of concentration, persistence and pace. (R. at 24) Plaintiff told Dr. Ball that she had been taking an anti-depressant for two years, but had never been to a psychiatrist or psychologist in that time. (R. at 196) Dr. Ball opined that she was depressed, secondary to her physical pain, but that her thought processes were clear, coherent and logical. (R. at 197-

98)   He assigned her Global Assessment of Function at 60. (R. at 198)[3]

Furthermore, Dr. Waters opined that Plaintiff's mental symptoms were mainly due to her physical condition.  (R. at 204) Dr. Tobe's examination showed that Plaintiff's mood was sad and irritable, but that her memory was intact and she was oriented as to time, person and place.  (R. at 338)  It is true that Ms. Pollack, a social worker and Plaintiff's therapist, in May of 2002 felt that Plaintiff could not work.  However, this opinion contradicts the rest of the medical evidence.  Looking at the record in its totality, there is little to suggest that Plaintiff meets the criteria of Listing 12.04, and as such, the ALJ's step three finding was supported by substantial evidence.

**3.   Whether the ALJ did not afford proper weight to the opinions of the Plaintiff's treating physicians and erroneously substituted her own medical judgment in place thereof**

Plaintiff argues the ALJ substituted her own opinion for Plaintiff's treating physicians' opinions that Plaintiff is disabled.  The Third Circuit has long held that "[a] court considering a claim for disability benefits must give greater weight to the findings of a treating physician." <u>Mason v. Shalala</u>, 994 F.2d 1058, 1067 (3d Cir. 1993).  <u>See</u>  <u>Kane v.</u>

---

[3] A global assessment of functioning score of 60 corresponds to "moderate symptoms."  American Psychiatric Ass's, <u>Diagnostic & Statistical Manual of Mental Disorders</u> 34 (4th ed. 1994)(DSM-IV-TR).

<u>Heckler</u>, 776 F.2d 1130, 1135 (3d Cir. 1985).  This is
particularly true "when the opinion reflects an expert judgment
based on a continuing observation of the patient's condition over
a prolonged period of time."  <u>Rocco v. Heckler</u>, 826 F.2d 1348,
1350 (3d Cir. 1987) (quoting <u>Podedworny v. Harris</u>, 745 F.2d 210,
217 (3d Cir. 1984)).

     The ALJ is not bound to accept the opinion of a treating
physician without weighing it against the other medical evidence
of record.  <u>Kent v. Schweiker</u>, 710 F.2d 110, 115 n.5 (3d Cir.
1983).  However, the ALJ cannot reject a treating physician's
testimony in the absence of contradictory medical evidence.  <u>See</u>
<u>Jones v. Sullivan</u>, 954 F.2d 125, 128-29 (3d Cir. 1991).  "Absent
persuasive contradictory evidence, the validity of the claimant's
symptoms can be conclusively established by the opinion of the
treating physician."  <u>Smith v. Sullivan</u>, 720 F. Supp. 62, 64
(E.D. Pa. 1989).   An ALJ can only reject the opinion of a
treating physician if he or she explains on the record the
reasons for doing so.  <u>See</u> <u>Allen v. Bowen</u>, 881 F.2d 37, 41 (3d
Cir. 1989); <u>Brewster</u>, 786 F.2d at 585.

     Here, however, no treating physician actually offered an
opinion that Plaintiff was disabled.  The strongest suggestion of
disability by a doctor is Dr. Testaiuti's statement that he might
suggest disability status "if nothing surgical can be done and
she does not feel that she can tolerate any sort of employment

29

options in her present condition." (R. at 170)  It is true, as
the ALJ noted, that Ms. Pollack opined that Plaintiff cannot
work.  However, a clinical social worker is not an acceptable
medical source. <u>See</u> 20 C.F.R. § 404.1513.  Furthermore, Ms.
Pollack's opinion is inconsistent with the state agency medical
consultant's opinion that Plaintiff could still work despite
limitations in the areas of daily activities, social functioning,
concentration, persistence and pace.  (R. at 215-31)  There is
nothing in the ALJ's opinion that is inconsistent with the
opinions of Plaintiff's treating physicians, who are acceptable
medical sources.  As such, the ALJ's determination is supported
by substantial evidence.

**4.   Whether the ALJ erroneously concluded that
Plaintiff maintains the residual work capacity to
perform her past relevant work**

Plaintiff argues that the ALJ erroneously concluded that
Plaintiff can perform light work, and had the residual functional
capacity to return to AAA as a travel clerk.  The determination
that a claimant can perform past relevant work, and is therefore
not disabled, is made by comparing the claimant's residual
functional capacity with the physical and mental demands of the
kind of work the claimant has completed in the past, without
consideration of the vocational factors of age, education, and
work experience.  <u>See</u> 20 C.F.R. § 404.1560(b)(1995).  Plaintiff
argues that no doctor supports the ALJ's finding that Plaintiff

30

is capable of sustaining the level of exertion, standing and
walking required at the light level.  (Pl. Br. at 30)  However,
although the diagnosis of a treating physician is considered as
to the question of whether at claimant is "disabled," the ALJ has
the final responsibility to determine claimant's residual
functional capacity to perform past relevant work.  See 20 C.F.R.
§ 404.1527(e)(2).

Here, with the exception of Dr. Testaiuti's statement that
Plaintiff would be disabled if she felt she could not work (R. at
170), no acceptable medical source opined that Plaintiff is
disabled.  Of course, the notion that disability may be
determined by the Plaintiff's subjective feelings of whether she
could not work is antithetical to the Social Security Act's
disability requirements in which, as explained above, disability
is based upon objective findings linked to medical facts.
Indeed, the ALJ based her decision regarding Plaintiff's residual
functional capacity on the entire record, including State Agency
physicians who did not find any reason to declare Plaintiff
disabled.  Dr. Prione found that Plaintiff can occasionally lift
up to 20 pounds, frequently lift 10 pounds, and stand or walk up
to 6 hours out of an 8 hour work day.  (R. at 234)  Another state
agency physician found, at most, moderate limitations on
Plaintiff's ability to understand, remember, concentrate,
interact socially and adapt.  (R. at 229-31)  The opinions of

non-examining state agency consultative physicians may constitute substantial evidence in support of a finding that an individual is not disabled.  See 20 C.F.R. §§ 404.1512(b)(6), 404.1527(f), 416.912(b)(6), and 416.927(f); SSR 96-6p.  Nothing in the record demonstrates significant disagreement by any acceptable treating medical source.

Moreover, Plaintiff's argument regarding the ALJ's determination on Plaintiff's residual functional capacity focuses on the testimony of Ms. Kelly, a vocational expert.  (Pl. Br. at 32-35).  Plaintiff argues that the ALJ described a hypothetical job to Ms. Kelly as one where Plaintiff could "sit or stand at times."  However, Plaintiff claims that the ALJ changed this to sit or stand "at will" in the opinion. (Pl. Br. at 32)[4]

---

[4] With regard to Ms.Kelly's testimony, Plaintiff takes issue with the ALJ's hypothetical question about Plaintiff's frequent lapses in concentration.  The ALJ asked the vocation expert if Plaintiff's concentration problems would prevent her from working.  The vocational expert responded that such lapses would prevent her from being productive. (R. at 65-67)  However, the ALJ conditioned this hypothetical on whether or not she found Plaintiff's claims regarding her ability to concentrate credible. The issue of Plaintiff's credibility will be dealt with in point five (5) of this discussion.

Also, Plaintiff argues that the ALJ's hypothetical questions lacked the specificity required by this Court.  See Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002)("Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence.") Specifically, Plaintiff takes issue with the ALJ's failure to include Plaintiff's need for a cane, lack of sensation in her hands, and her obesity.

Regardless, considering the state agency physician's opinion regarding Plaintiff's ability to sit or stand, the vocational expert's testimony is not controlling here.  The hypothetical posed to Ms. Kelly was complete in all material respects, and the ALJ did not err to rely upon this expert's responses.

### 5.   Whether the ALJ's finding regarding Plaintiff's credibility is contradicted by the evidence

This court declines to substitute its own determination of credibility for that of the ALJ, given that the ALJ had the opportunity to observe the plaintiff first-hand.  See Wier v. Heckler, 734 F.2d 955, 962 (3d Cir. 1984) (recognizing that great deference is given to ALJ's determination of credibility).  It is within the ALJ's discretion "'to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.'" Brown v. Schweiker, 562 F. Supp. 284, 287 (E.D. Pa. 1983) (quoting Bolton v. Secretary of Health & Human Servs., 504 F. Supp. 288, 291 (E.D.N.Y. 1980)).

---

However, a state agency physician opined that Plaintiff could walk without the cane (R. at 235), and both Drs. Ressler and David found Plaintiff's sensation and deep tendon reflexes to be normal.  (R. at 314-17, 325-36)  Further, the vocational expert had the opportunity to see Plaintiff at her hearing, so presence of obesity would be apparent to the expert.  Also, the ALJ acknowledged the difficulty Plaintiff had with her weight was present, but found that Plaintiff's claims regarding her weight were exaggerated. (R. at 22)  Again, questions regarding Plaintiff's credibility will be dealt with below.

Here, the ALJ based her determination of Plaintiff's
credibility on her testimony in light of the objective medical
evidence and other findings.  Specifically, the ALJ attributed
Plaintiff's lack of credibility to conflicting accounts regarding
her "constellation of symptoms."  (R. at 28)  The ALJ noted
specific contradictions, such as Plaintiff's friend stating
Plaintiff spent all day on the sofa and did not socialize or
clean, and Plaintiff testifying that she did light cooking,
lifted garbage bags and had a boyfriend. (R. at 24)  The ALJ also
noted conflicting accounts by treating physicians as to
Plaintiff's complaints. Plaintiff told Dr. Waters she did no
chores, and in the same month told Dr. Citta-Pietrolungo that she
was independent in self-care.  (R. at 24)

Previous accounts of Plaintiff's incapacity were highly
contradicted by her own testimony; Plaintiff testified that she
could sit for two hours, walk for 20 minutes, lift 5 to 10
pounds, drive, cook, read and shop (sometimes alone).  (R. at
24)[5]  Moreover, Dr. Prione also opined that Plaintiff's reports
of pain were disproportionate to the objective findings, which

_____

[5]  Plaintiff argues that the ALJ placed too much emphasis on
what she believed to be "exaggerated" accounts of Plaintiff's
weight fluctuation and whether or not Plaintiff truly suffered
from severe headaches. (Pl. Br. At 36)  However, even if
Plaintiff's accounts concerning her weight and headaches were
afforded full credibility, the ALJ did not focus her credibility
judgment on these findings.  (R. at 24) Rather, the ALJ's opinion
seems mostly persuaded by Plaintiff's varying, and often
contradictory, descriptions as to functional capacity.

were clinically minimal.  (R. at 238)  This Court finds that the ALJ, having considered the evidence and having had the ability to observe Plaintiff first hand, did not abuse her discretion in evaluating the credibility of Plaintiff's disability claims. Accordingly, the ALJ's assessment of Plaintiff's credibility is supported by substantial evidence in the record.

## III.  <u>CONCLUSION</u>

For the reasons stated above, the Commissioner's finding that Plaintiff is "not disabled" will be affirmed.  The accompanying Order is entered.

**March 29, 2006**
DATE

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
United States District Judge